UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
XUE QIN LIU,

                              Plaintiff,              **MEMORANDUM & ORDER**

            -against-                                 **18-CV-6764 (NGG) (CLP)**

TD AMERITRADE, INC.,

                              Defendant.
_____

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Xue Qin Liu brings this suit against Defendant TD Ameritrade, Inc. alleging violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et. seq.*, and New York General Business Law § 349. (Compl. (Dkt. 1) ¶ 6.) Plaintiff's claims are based on Defendant's failure to adequately investigate unauthorized transactions on Plaintiff's account and Defendant's allegedly deceptive claim that it had conducted an adequate investigation. (*Id.* ¶¶ 4, 50-51, 56.)

Before the court is Defendant's motion to compel arbitration and stay further proceedings pending the completion of arbitration. (Not. of Mot. ("Mot.") (Dkt. 17).) For the following reasons, Defendant's motion is GRANTED PART and DENIED IN PART. Specifically, the motion is granted insofar as it seeks to stay proceedings and compel arbitration pursuant to the original Scottrade Brokerage Account Agreement. In all other respects, the motion is DENIED.

I.      BACKGROUND

        A.      Statement of Facts

Unless otherwise noted, the following facts are undisputed. Where the facts are disputed, the court notes the dispute and

1

credits Plaintiff's version of the facts if it is supported by the record. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) ("Courts deciding motions to compel . . . draw[] all reasonable inferences in favor of the non-moving party.").[1]

1.   Plaintiff's Contract with Scottrade and the Transition to TD Ameritrade

In September 2008, Plaintiff opened a bank account with Scottrade, Inc. ("Scottrade") and signed the Scottrade Brokerage Account Application. (Scottrade Brokerage Account Appl. ("Scottrade Appl.") (Dkt. 17-3).) The Scottrade Application included reference to, and was accompanied by, the Scottrade Brokerage Account Agreement ("SBAA"). (Scottrade Appl. at 2; Decl. of C. Derbak (Dkt. 17-2) ¶ 6.) The SBAA includes a pre-dispute arbitration clause at paragraphs 28-29, and the Scottrade Application explicitly references the SBAA's arbitration provisions directly above the signature line. (SBAA (Dkt. 17-4) ¶¶ 28-29; Scottrade Appl. at 2.) The SBAA includes a Missouri choice-of law clause and provides that arbitration proceedings will be governed by the rules of the arbitration forum in which a claim is filed. (SBAA ¶¶ 28, 35.)

In September 2017, Defendant acquired Scottrade and in February 2018 converted all Scottrade accounts into TD Ameritrade accounts. (Compl. ¶ 13; TD Ameritrade-Scottrade Transition Hub ("Transition Hub") (Dkt. 17-11) at ECF 4.) Prior to transitioning her account from Scottrade to TD Ameritrade, Defendant sent Plaintiff no fewer than six emails about the transition between January 23, 2018 and February 15, 2018. (January 23, 2018 Email Not. ("Email 1") (Dkt. 17-5); January 24, 2018 Email Not. ("Email 2") (Dkt. 17-6); February 8, 2018 Email Not. ("Email 3")

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted and all alterations are adopted.

(Dkt. 17-7); February 8, 2018 Email Not. ("Email 4") (Dkt. 17-8); February 15, 2018 Email Not. ("Email 5") (Dkt. 17-9); February 15, 2018 Email Not. ("Email 6") (Dkt. 17-10).)

The first email, which Plaintiff received on January 23, 2018, informed her about the transfer from Scottrade to TD Ameritrade and stated four times that the transfer would take place "automatically," and, in large text, that "[t]here's nothing you need to do." (Email 1.) This first email also included a link to the terms and conditions that would apply to the TD Ameritrade account, and a paragraph indicating that Plaintiff had until February 23, 2018 to opt out. (*Id.* at ECF 3-4.) However, it does not appear from the record that these "terms and conditions" included any new or modified arbitration provision. The second email, which Plaintiff received on January 24, 2018, advised three times that the transfer would take place "automatically," and repeated in large text that "[t]here's nothing you need to do." (Email 2.) The second email again noted that Plaintiff had the ability to opt out of the transfer, and this time included a link to the TD Ameritrade Investment Management Service Agreement, which also, it appears from the record, did not include any information about arbitration. (*Id.* at ECF 3.) The third email, which Plaintiff received on on February 8, 2018, specifically advised that the transition would be complete as of Monday, February 26, 2018, and that Plaintiff would be unable to access her account over the weekend prior to the transition. (Email 3.) The email also stated that as of February 23, 2018 TD Ameritrade would no longer accept Scottrade forms and agreements and included a link to the "form library" which contained the corresponding TD Ameritrade forms, but did not include any information about arbitration. (*Id.* at ECF 4.) Larger text further down the page highlighted links to the TD Ameritrade website, account statement guide, and business continuity statement. (*Id.* at ECF 4-5.)

The fourth email, which Plaintiff also received on February 8, 2018, repeated that the account transition would take place automatically, and included three links to the "Transition Hub" for "important information and personalized details" about her account, including the "documents and disclosures" that would apply to Plaintiff's TD Ameritrade account, which, as discussed in greater detail below, included a link to the TD Ameritrade Client Agreement ("TDACA"). (Email 4.) The fifth email, which Plaintiff received on February 15, 2018, again confirmed the transition date and provided login instructions for her new account. (Email 5.) The sixth email and final email, which Plaintiff received on February 15, 2018, again confirmed the transition date, and included five links to the Transition Hub. (Email 6.)

The Transition Hub itself, a link to which was included only in emails 4 and 6, included some 15 pages of information and links pertaining to the Plaintiff's TD Ameritrade account. (Transition Hub at ECF 5.) The Transition Hub also included one link to the TDACA. (*Id.* at ECF 12.) The TDACA contains an arbitration clause providing that all arbitrations would be conducted pursuant to the FINRA Code of Arbitration. (TDACA (Dkt. 17-12) ¶¶ 12, 14.)

> 2.    Alleged Identity Theft and T.D. Ameritrade's Response

In March 2018, Defendant allegedly mailed Plaintiff a debit card. (Compl. ¶ 15.) However, Plaintiff never received the card and alleges that someone stole it from her mail. (*Id.* ¶¶ 16-17.) Between March 10 and March 22, 2018, the card was used to make $30.946.59 of transactions and withdrawals around the New York City area, all of which Plaintiff alleges were unauthorized. (*Id.* ¶¶ 18-19.) Because Plaintiff generally wrote checks to withdraw funds or make purchases and rarely used the debit card associated with the account, the allegedly unauthorized use of

the debit card and the purchases themselves were inconsistent with Plaintiff's purchasing history. (*Id.* ¶¶ 14, 20-21.) Additionally, between March 16 and March 18, 2018, a male individual placed multiple calls to Defendant claiming to be Plaintiff, who is female. (*Id.* ¶ 23.) Defendant did not notify Plaintiff of the unusual account activity or suspicious phone calls. (*Id.* ¶¶ 22, 26.)

On March 28, 2018, Defendant called Plaintiff and informed her that her account lacked funds. (*Id.* ¶ 27.) Until this point, Plaintiff had been unaware of the unusual transactions and she formally disputed them that same day. (*Id.* ¶¶ 28-29.) In a letter dated April 9, 2018, Defendant informed Plaintiff that it had conducted an investigation into the unauthorized transactions and determined that it was "very likely that an unauthorized party intercepted, activated, and used [Plaintiff's] Visa debit card before [Plaintiff] received it in the mail." (*Id.* ¶¶ 30-31.) The letter further requested that Plaintiff assist in the investigation by filing a police report and completing an affidavit of fraud, which she did on April 11, 2018. (*Id.* ¶¶ 32-33.)

In a letter dated April 11, 2018, Defendant informed Plaintiff that its investigation "determined that an error did not occur," that the matter was considered resolved, and that it would not be crediting Plaintiff's account. (*Id.* ¶ 34.) Plaintiff requested documentation explaining Defendant's decision but did not receive any. (*Id.* ¶¶ 35-36.) On May 9, 2018 Plaintiff called Defendant to inquire further, and Defendant informed her that the card had been activated with her social security number but did not elaborate further. (*Id.* ¶¶ 37-39.) Since these events, Plaintiff has received numerous letters from credit card companies rejecting credit card applications that she alleges she did not fill out, furthering Plaintiff's belief that her identity was stolen. (*Id.* ¶ 40.)

## B.   Procedural History

Plaintiff filed this action on November 28, 2018 seeking damages under the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et. seq.*,

and New York General Business Law § 349. (Compl.) On February 12, 2019 Defendant filed a request for a pre-motion conference in anticipation of filing the instant motion. (Mot. for Pre Mot. Conf. (Dkt. 10).) At that conference, the court directed the parties to pursue mediation before proposing a briefing schedule. (February 13, 2019 Order; March 6, 2019 Minute Entry for Proceedings.) The motion was fully briefed on May 17, 2019. (*See* Mot.; Mem. in Supp. ("Mem.") (Dkt. 17-1); Mem. in Opp. ("Opp.") (Dkt. 17-13); Reply Mem. in Further Supp. ("Reply") (Dkt. 17-14).)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "This policy is founded upon a desire to preserve parties' ability to agree to arbitrate, rather than litigate, their disputes." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). Under Section 4 of the FAA, a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may file a motion to compel, which a court must grant "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4; *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 354-55 (2011) (Thomas, J., concurring). Though favored as a matter of policy, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011).

Thus, a motion to compel arbitration requires the court to address two issues: "(1) whether the parties have entered into a valid agreement to arbitrate; and if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *Id.* at 128; *see also Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.").

The first question "is one only a court can answer, since in the absence of any arbitration agreement at all, questions of arbitrability could hardly have been clearly and unmistakably given over to an arbitrator." *VRG Linhas Aereas S.A. v. Matlin Patterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 n.2 (2d Cir. 2013). This question is answered under state contract law. *Meyer*, 868 F.3d at 73-74. In evaluating the second question, "courts presume that the parties intend courts, not arbitrators, to decide . . . disputes about arbitrability." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014). Thus, absent a clear delegation of such authority to an arbitrator, "the question of whether or not a dispute is arbitrable is [also] one for the court" *Citigroup Glob. Mkts. Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014). Where courts have the authority to make this determination "the federal policy in favor of arbitration requires that any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration." *Telenor Mobile Comms. AS v. Storm LLC*, 584 F.3d 396, 406 (2d Cir. 2009).

In deciding a motion to compel arbitration, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir.

2011) ("If there is a genuinely disputed factual issue whose resolution is essential to the determination of the applicability of an arbitration provision, a trial as to that issue will be necessary; but where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and avoid the need for further court proceedings."). As such, the court evaluates any disputes concerning whether an agreement to arbitrate was formed to determine "whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012). In making this determination, the court may consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Meyer*, 868 F.3d at 74.

Finally, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.- Ala. v. Randolph*, 531 U.S. 79, 91 (2000); *see also Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342-43 (S.D.N.Y. 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense.").

## III.   DISCUSSION

Plaintiff initially disputes that an agreement to arbitrate exists at all. (*See generally* Opp.) Plaintiff additionally argues that if an agreement to arbitrate is found, this court should enforce the arbitration provision contained within the original SBAA. (*Id.*) Defendant, meanwhile, seeks enforcement of the TDACA's arbitration provision. (*See generally* Mem.)

For the following reasons, the court agrees with Defendant that there is a valid agreement to arbitrate between the parties, but agrees with Plaintiff that this agreement is the SBAA, not the TDACA.

The first agreement to arbitrate which could bind the parties is the SBAA. The SBAA contains a choice of law provision specifying that its enforcement shall be governed by Missouri law. (SBAA ¶ 35.) However, because Plaintiff disputes that the SBAA applies at all, "[a]pplying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." *Schnabel*, 697 F.3d at 119. As such, either the law of New York, where Plaintiff resides, or Missouri, where Scottrade was formerly located could apply. *See id.* However, because New York and Missouri "apply substantially similar rules for determining whether the parties have mutually assented to a contract, [w]hich state's law applies is therefore without significance." *Id*; *see Meyer*, 868 F.3d at 74 (noting that New York law requires mutual manifestation of assent to form a contract); *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 561 (8th Cir. 2008) (under Missouri law, questions of contractual formation are decided with reference to outward manifestations of assent by parties).

When Plaintiff opened her bank account with Scottrade, she signed the Scottrade Account Application, which plainly states above the signature line in both English and Chinese, "[b]y signing this agreement I acknowledge that I have received, read and agree to abide by the terms of the accompanying Brokerage Account Agreement which contains a pre-dispute arbitration clause at paragraph 29." (Scottrade Appl. at 2.) Paragraph 29 of the SBAA, which accompanied the Scottrade Application, provides that, by signing the agreement, "[y]ou agree to arbitrate any controversy between you and us," and the preceding paragraph

informs the applicant that "[a]ll parties to this agreement are giving up the right to sue each other in court . . . except as provided by the rules of the arbitration forum in which a claim is filed." (SBAA ¶¶ 28-29.)

In arguing that no valid agreement exists, Plaintiff does not argue that the Scottrade Application and SBAA itself could not amount to an enforceable agreement to arbitrate. Instead, Plaintiff contends that Defendant has not proven that the version of the SBAA in the record is the version that accompanied the Scottrade Application. Specifically, Plaintiff argues that Candy Derbak, the individual who signed the declaration to which the Application and SBAA were attached, did not become a Scottrade employee until five years after Ms. Liu signed the Scottrade Application and thus "has no personal knowledge of . . . which version, if any, of the SBAA was provided to [Plaintiff]." (Opp. at 3.) While that may be true, "qualified witnesses may make admissible statements based on their review of business records." *Kernaghan v. Forster & Garbus, LLP*, No. 18-CV-0204 (SFJ), 2019 WL 981640, at *4 (E.D.N.Y. Feb. 25, 2019); *see also* Fed. R. Evid. 803(6)(b). Even a cursory review of Ms. Derbak's declaration makes clear that she has amply satisfied the requirements of the federal rules applicable to business records and, as such, her testimony on this matter is admissible. (*See* Decl. of C. Derbak ¶¶ 3-5.) Accordingly, the court finds Plaintiff's signature on the Scottrade Application constitutes a clear and outward manifestation of her assent to be bound by the SBAA and its arbitration provision. That provision is therefore enforceable.

Having resolved that matter, the court turns its attention to the second potential agreement between the parties, the TDACA. Unlike the SBAA, Plaintiff never affirmatively signed the TDACA. Defendant, however, contends that the emails it sent to Plaintiff during the transition period were sufficient to put her on notice that the transition to TD Ameritrade would be accompanied by a

new account agreement, and that Plaintiff assented to the terms of that agreement by continuing to use her account following the transition. (*See* Reply at 3-4.)

In order for Plaintiff's silence to constitute acceptance of the TDACA, she must have at least been on inquiry notice of its terms. *See, e.g.*, *Arnaud v. Doctor's Assocs., Inc.*, No. 18-CV-3703 (NGG), 2019 WL 4279268, at *5 (E.D.N.Y. Sept. 10, 2019). Under New York law,[2] this determination is made with reference to "whether the term was obvious, or whether it was called to [the party's] attention." *Starke*, 913 F.3d at 289. "This often turns on whether the contract terms were presented . . . in a clear and conspicuous way." *Id.*

---

[2] The parties do not dispute or even attempt to discern which state's law should apply to resolve this question, an issue which the court resolves with reference to New York choice-of-law rules. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

As noted, *supra,* Plaintiff resides in New York. Defendant is headquartered in Nebraska, which does not appear to have a robust body of law relating to this specific issue; the court was only able to locate a single case in which a Nebraska court considered the enforceability of so-called "clickwrap" agreements (although that court, relying on a Tenth Circuit decision, conducted a similar inquiry to that which New York courts conduct). *See Bell v. Care.com*, No. Cl. 14-4139, 2016 WL 1258333, at *2 (Neb. Dist. Ct. Mar. 22, 2016). However, New York and Nebraska both adhere to the general underlying rule on which that inquiry is based, *i.e.*, that contracts cannot be formed absent mutual assent by the parties thereto. *Compare Gibbons Ranches, LLC v. Bailey*, 289 Neb. 949, 953-54 (2015) *with Cullinane v. Beverly Enterprises-Nebraska, Inc.*, 300 Neb. 210, 229 (2018) *with Arnav Indust., Inc. Retirement Trust v. Brown, Raysman, Millstein, Felder & Steiner, L.L.P.*, 96 N.Y.2d 300, 304-05 (2001). As such, the court has no reason to suspect that Nebraska courts would resolve this issue differently from New York courts and therefore applies New York law. *See Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference [between the law of two jurisdictions] . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.").

In this case, the TDACA and its arbitration provision were not sufficiently conspicuous for Plaintiff to have been on inquiry notice. The account transition emails repeatedly assured Plaintiff that the transition would occur "automatically," and (in large text) that "there [was] nothing [she] need[ed] to do." (*E.g.*, Email 1.) Only by navigating to the Transition Hub via a link only present in the fourth and sixth emails, and then navigating to the Client Agreement link once in the Transition Hub, would Plaintiff have been able to access the TDACA. (Email 4; Transition Hub.) Even then, however, Plaintiff would still have had no outward indication that the TDACA contained an arbitration provision until she had read to page 8 of 9, where the provision was located, albeit in bold typeface. (*See* TDACA at 8.) This confusing maze of links and forms falls far short of the "clear and reasonably conspicuous" notice on "uncluttered" pages that courts have previously held sufficient to bind a party to an arbitration agreement. *Meyer*, 868 F.3d at 78-79 (applying California law); *see also, e.g.*, *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035-36 (7th Cir. 2016) (arbitration provision was not binding where notice was not conspicuous and company's website was "actively mislead[ing]" (applying Illinois law)); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (arbitration provision in terms of service not sufficiently conspicuous where, *inter alia*, means to access terms of service was unclear) (applying New York law)). Accordingly, the court finds that Plaintiff has not assented to the TDACA, and the SBAA remains the only enforceable agreement between the parties.

## IV.   CONCLUSION

For the forgoing reasons, Defendant's (Dkt. 17) Motion to Compel Arbitration is GRANTED IN PART and DENIED IN PART. The motion is granted to the extent that the court compels arbitration in accordance with the Scottrade Brokerage Account Agreement and further proceedings in this action are STAYED pending the

completion of arbitration. The motion is DENIED in all other re-spects.

SO ORDERED.


Dated:      Brooklyn, New York
                 May 4, 2020

                                                                    /s/ Nicholas G. Garaufis
                                                                   NICHOLAS G. GARAUFIS
                                                                   United States District Judge

13